114 N.J. Super. 104 (1971)
274 A.2d 854
WILLIAM S. RUDDEROW, WILLIAM X. BONNER AND MARYANNE A. BUSHA, PLAINTIFFS,
v.
THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MOUNT LAUREL, THE TOWNSHIP OF MOUNT LAUREL, A MUNICIPAL CORPORATION, AND HANNAH A. ROSING, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 4, 1971.
As Amended March 25, 1971.
*105 Mr. William B. Scatchard, Jr., for plaintiffs (Messrs. Capehart and Scatchard, attorneys).
Mr. Malcolm L. Block for defendants (Messrs Beck and Block, attorneys).
MARTINO, A.J.S.C.
This is an action in lieu of prerogative writs to determine the legality of a tentative approval granted by defendant township for a planned unit development granted under the provisions of an ordinance which was adopted under the legislative mandate of N.J.S.A. 40:55-54 et seq.
On or about April 10, 1970 the township committee by majority vote adopted certain findings of fact as required by N.J.S.A. 40:55-61 and adopted a resolution granting tentative approval to the developer.
The plaintiffs, who are taxpayers of defendant municipality, contend that the approval by the township was improperly granted for reasons which will be revealed in the course of these conclusions.
*106 One facet of plaintiffs' contentions requiring primary consideration is the interpretation of a section of the statute, N.J.S.A. 40:55-57(a), which was adopted word for word in the ordinance. That section reads:
(a) Permitted uses. An ordinance adopted pursuant to this act shall set forth the uses permitted in a planned unit development, which uses may include and shall be limited to (1) dwelling units in detached, semidetached, attached, groups of attached or clustered or multistoried structures, or any combination thereof; and (2) any nonresidential use, to the extent such nonresidential use is designed and intended to serve the residents of the planned unit development, and such other uses as exist or may reasonably be expected to exist in the future, and (3) public and private educational facilities, and (4) industrial uses and buildings. [Emphasis added]
While it is conceded that the first portion of the underlined section ending with the word "development" limits the extent of the nonresidential uses, defendant owner-developer contends that the latter part of the underlined portion and other sections of the statute and ordinance would permit nonresidential uses to serve others outside the area of the planned unit.
Parenthetically, it should be noted that the political complexion of the township has changed since tentative approval was granted, and the township as now constituted does not oppose plaintiffs' cause of action.
Planned unit development had its genesis when the Urban Land Institute, which is an independent, nonprofit organization incorporated under the laws of the State of Illinois, initiated interest in this new land use philosophy. The statement of objectives of that organization indicates that its interests and activities cover the entire field of urban planning, growth and development. Among the principal purposes of the Institute are to study and to interpret trends in real property and to seek their orientation in the changing economic, social and civil needs of the country; to study principals and methods by which urban land can be developed and improved most efficiently, and to act as a clearing house *107 in this field for the dissemination of information in the form of case material, monographs and technical journals. Members of the Washington, D.C.  based Institute include land developers, builders, architects, city planners, investors, planning and renewal agencies, financial institutions and others professionally interested in land uses. This organization issues technical bulletins. Urban Land Institute Technical Bulletin No. 52 first brought to light a model statute, the authors of which were two lawyers from the State of Illinois and Jan Krasnowiecki, a Professor of Law of the University of Pennsylvania. The model statute was to apply to those developments which were residential in nature, and was referred to as a Planned Unit Residential Development (PURD).
Our statute was not to be so limited. Its title removes the word "residential" and reads, "Municipal Planned Unit Development Act."
However, when our Legislature adopted the present statute it used the language in the model statute, viz., "any non-residential use, to the extent such non-residential use is designed and intended to serve the residents of the Planned Unit Development," and added to this the words, "and such other uses as exist or may reasonably be expected to exist in the future."
Planned unit developments have received favorable comments in law reviews in all parts of this country. The efforts of those seeking imaginative, flexible and creative results from planning, zoning, and land use control have recently been concentrated on planned unit developments. 35 Mo. L. Rev. 27 (1970); also see John D. Johnston, Jr., "Developments in Land Use Control," 45 Notre Dame Lawyer 399, 402 (1970); "Zoning: Planned Unit Development  The Attorney and the City Planner," 22 Okla. L. Rev. 108 (1969); "Kentucky Planning and Land Use," 56 Ky. L.J. 598 (1968).
Many developers are disenchanted with our contemporary massive development of uniform housing types, be they of *108 the single-family or multi-family variety. Lloyd, "A Developer Looks at Planned Unit Development," (Symposium: Planned Unit Development), 114 U. of Pa. L. Rev. 3 (1965). More than 30 years ago Radburn, New Jersey showed how man and automobile both gain from a super block planned with central park, a peripheral collector street, and quiet, safe, residential lanes between. Hanke, "The FHA's View," U. of Pa. L. Rev., supra, at 15. The existing controls, it is often noted, tend to focus on the individual lot, a focus which makes sense where development occurs on an individual lot basis but which offers the residential developer nothing better than a "cookie cutter" with which to create. Krasnowiecki, "A Law Professor's View," Id., at 47.
Earlier we referred to the fact that the ordinance under permitted uses was word for word with the statute, with the reference to the restricted quantum of nonresidential uses. In addition to the restriction set forth under permitted uses, the ordinance under paragraph 111, D-1, again states, "* * * commercial uses and buildings designed and intended to serve the residents of the planned community." (Emphasis added)
No provision in the developer's plan is made for industrial, although the area selected was zoned industrial, and N.J.S.A. 40:55-57(a)(4) provides for industrial use. The developer concedes that the development, as far as the commercial structures are concerned, far exceeds the need of those who will occupy the dwelling units to be constructed in the planned community. The developer contends that under a planned unit development (PUD) there are no restrictions on the quantum of commercial structures, while there may be under a planned unit residential development (PURD).
The inartistic attempt to draft a proper enabling statute has created confusion as to what was meant by the Legislature. While the enabling statute seems to restrict nonresidential uses, on at least one occasion the ordinance appears to restrict nonresidential or commercial uses in two sections. In attempting to construe the intent of the Legislature, we referred to the history of this legislation, but this *109 proved unenlightening. It appears that on April 4, 1966 Senate Bill 321 was introduced in the State Legislature and it provided for a planned unit residential development (PURD). This died in committee. On January 16, 1967 Senate Bill 60 was introduced and this also provided for a planned unit residential development (PURD). This also died in committee.
On April 10, 1967 Senate Bill 452 was introduced, and this was adopted by both houses with many amendments suggested and incorporated by the Assembly. This bill with its amendments became chapter 61, Laws of 1967, and presently known as N.J.S.A. 40:55-54 et seq. The object in the title was for planned communities, and later the act came to be known as "Municipal Planned Unit Development Act (1967)."
None of the amendments proposed in the Assembly and adopted was directed to the section on permitted uses.
In both Senate Bills 321 and 60, supra, a provision concerning the limitation of nonresidential uses did not contain the additional provision which appears in N.J.S.A. 40:55-57 (a)(2), viz, "* * * and such other uses as exist or may reasonably be expected to exist in the future." (Emphasis added)
There is no Statement annexed to the adopted statute. The fact that the section in question was enlarged upon in the adopted statute may give some reason for the position taken by the developer.
At the suggestion of this court, counsel at a supplementary hearing produced Professor Krasnowiecki, one of the authors of the model statute. The court's purpose was not to augment the record below, but to attempt to learn better the objectives of this new philosophy. The model statute appears in Urban Land Institute Bulletin Number 52, at 69 and U. of Pa. L. Rev., supra, at 140. While he acknowledged that the Legislature copied provisions of his model statute in N.J.S.A. 40:55-57, particularly under permitted uses, he was unable to clearly establish what was meant by our Legislature when *110 it added the phrase, "* * * and such other uses as exist or may reasonably be expected to exist in the future." (Emphasis added)
He made it clear that his model statute pertained to planned unit residential development (PURD), although he saw nothing wrong in a statute which would enlarge upon the scope and purpose of the philosophy which was the basis for the model statute.
One of the objectives of a planned unit development is to provide for common open spaces, and it permits a developer to disregard the density or intensity for land use as provided in a zoning ordinance previously enacted under N.J.S.A. 40:55-30 et seq. However, where intensity is increased, it is assumed that the reduced size of a permitted lot will create the balance of the area exclusive of streets as common open space. U. of Pa. L. Rev., supra, at 49.
Our statute, N.J.S.A. 40:55-57(c), states:
* * * an ordinance * * * shall require that any common open space resulting from the application of standards for density or intensity of land use be set aside for the use and benefit of the residents in such development * * *.
An examination of the local ordinance does not specifically seem to follow this requirement. However, the ordinance does limit such open space to 15% of the total residential area, and the township's findings as required by the statute in section 17 of the ordinance fail to indicate any specific conclusion as to the purpose, location and amount of the common open space, although it is required to do so. N.J.S.A. 40:55-61 (b)(3).
Article 4, § 6, para. 2 of our State Constitution provides:
The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the *111 exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature. [Emphasis added]
N.J.S.A. 40:55-31 follows the dictates of the constitutional mandate in providing that a municipality be divided into districts, etc. This very question was decided in Rock Hill v. Chesterfield Township, 23 N.J. 117 (1957).
One of the purposes outlined in our Municipal Planned Unit Development Act provides:
To insure that the provisions of Revised Statute 40:55-30 et seq., which direct the uniform treatment of dwelling type, bulk, density and open space within each zoning district, shall not be applied to the improvement of land by other than lot by lot development in a manner that would distort the objectives of Revised Statute 40:55-30 et seq. [N.J.S.A. 40:55-55].
N.J.S.A. 40:55-30 provides in part:
Any municipality may by ordinance, limit and restrict to specified districts and may regulate therein, buildings and structures according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority, subject to the provisions of this article, shall be deemed to be within the police power of the State. * * *.
The above statute would seem to imply that the preparation of an ordinance under N.J.S.A. 40:55-54 would require some indication of a district or districts in which a planned unit development can be constructed. The ordinance of defendant municipality declares that any district within the township may be used as sites for planned communities or planned unit development. (Emphasis added) This would appear to be in conflict with the constitutional requirements, supra, and the provisions of N.J.S.A. 40:55-30, which refers to specified districts.
The Municipal Planned Unit Development Act, in its reference to common open space, requires that an ordinance shall contain provisions by which the amount and location of *112 any common open space shall be determined. N.J.S.A. 40:55-57(c).
The ordinance provides:
The amount, location or locations, types, configuration, topography, and maintenance of open space * * * shall be reviewed and approved by the Township Committee. It shall make detailed findings of the adequacy or inadequacy of the aforementioned items in conformance with the provisions of the enabling legislation. [Emphasis added.]
The findings of fact make no detailed findings of the adequacy of the common open spaces  only the conclusionary statement that "the purpose, amount and location of open space as related to the proposed density and type of development is adequate."
One of the prime objectives of a planned unit development is the availability and quantum of space made possible by the deviation from the usual zoning requirements.
There seems to be some misunderstanding as to open space and common open space. The developer would appear to see no distinction between the terms. In one part of the ordinance there is a reference to open space in regards to the residential area, and it provides that "suitable land equal in area to at least 15% of the total residential area shall be designated as open space." Following that provision, there appears another statement which reads:
Usable open space shall be one thousand square feet per multiple family dwelling. Usable open space for multiple-family dwelling units may include patios, landscaped areas of the site, and other areas within a multi-family residential site which can be used for open space purposes, in addition to the 15% common open space. [Emphasis added].
When the ordinance required the detailed findings of the adequacy of open space, a strict interpretation of this provision would require not mere conclusions. The findings should have facts which would justify a basis for that finding.
*113 Local officials must be on their guard, since this type of a development can be used as a subterfuge to evade the provisions of N.J.S.A. 40:55-30 et seq. They must guard against inadequate safeguards in the case of incompetent or impecunious developers.
A careful reading of the various transcripts made of the hearings creates some confusion as to the procedures and substances contained therein. On November 3, 1969 the public hearing was declared concluded. On December 29, 1969 the transcript indicates the mayor announced that in accordance with the decision of the committee the hearings were being reopened. At that meeting the main thrust concerned the economics of the proposed project. This resulted in further hearings, and again the township met on January 21, 1970 and February 9, 1970, when the hearings were concluded.
While a development under a planned unit development philosophy can give advantages to the general public, its abuse can work only to the economic advantage of a developer. In this case a reading of the voluminous testimony of the many public hearings indicates much confusion on the part of the township officials and a continuous hodgepodge of statistics which at times seem inconsistent with other testimony in previous or subsequent hearings.
This is borne out by the resolution of the township committee granting tentative approval to the applicant. It appears that on or about April 10, 1970, after the concluding hearing of February 9, 1970, the township committee granted tentative approval with certain conditions, one of which was that the applicant
Within 30 days of the date of the resolution submit revised tables relating to "proposed land uses and density", "estimated public school enrollment", "costs and revenue", and "anticipated schedule of development, incorporating all up to date information."
The applicant did file a revised table of "proposed land uses and densities" on April 20, 1970, which indicated that *114 63.1 acres were to be devoted to commercial use while 56.1 acres were to be devoted to residential. The findings of fact, however, indicate approximately 58 acres devoted to commercial use and fails to delineate the quantum of acreage devoted to residential. The findings do, however, refer to the fact that 975 dwelling units are to be provided, reduced from 1038 as set forth in the original application.
Most of the ordinances which have been examined by the court have delineated percentage-wise the quantum of residential, commercial, industrial and open space in a planned unit development. The Township of East Windsor, Mercer County, New Jersey, by amendment to an ordinance, which amendment was adopted October 2, 1967, divided its municipality into eight classes of districts in which provision was made for the establishment of a planned unit development district. The ordinance was careful to delineate by some means of ascertainment the quantum of residential, commercial, industrial and open space. In Cheney v. Village 2 at New Hope, Inc., 429 Pa. 626, 241 A.2d 81 (1968), the Pennsylvania Supreme Court passed upon a PUD ordinance which provided for PUD districts in which the uses were confined to percentages and found no fault with that classification.
The ordinance in the case at hand made no provisions as to the quantum of residential uses to be contained in the planned unit development, which may have caused a reduction of such uses as indicated in the findings of fact.
Our present statute on planned unit development needs attention and clarification. Only those who understand this new philosophy and the requirements of N.J.S.A. 40:55-30 et seq. and our constitutional restrictions, should attempt to mold the statute which would in every detail be consistent with the existing state of the law. While zoning concepts are rapidly evolving, from static specifications referred to as "Euclidean zoning," after the well-known decision in Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), to flexible techniques which many planners have *115 embraced, there does appear an omnipresent struggle between a land owner-developer attempting to maximize his economic return and the local officials striving to harmonize any such interests with the broader social view of the entire community.
To summarize these findings, it is the judgment of this court that the provision of the statute and the ordinance do not permit the construction of nonresidential uses beyond those intended to serve the residents of the planned community; the ordinance fails to delineate the method common open space should be determined before an approval is granted an applicant; the findings of facts do not fully conform with the facts as they appear of record in behalf of the applicant; the ordinance is invalid in that it does not provide for specific districts as required by the statute and Constitution of this State. Therefore, the tentative approval granted by defendant municipality should be set aside.